J-S18031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF: A.S.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.L.H., MOTHER | |
| | No. 77 WDA 2025 |

Appeal from the Decree Entered December 18, 2024
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
52A in Adoption 2024

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF: R.D.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.L.H., MOTHER | |
| | No. 78 WDA 2025 |

Appeal from the Decree Entered December 18, 2024
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
52 in Adoption 2024

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF: J.M.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.L.H., MOTHER | |
| | No. 79 WDA 2025 |

Appeal from the Decree Entered December 18, 2024
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
52B in Adoption 2024

J-S18031-25

BEFORE:   DUBOW, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED: June 27, 2025**

C.L.H. ("Mother") appeals from the decrees entered in the Court of Common Pleas of Erie County Orphans' Court, which involuntarily terminated her parental rights to her three minor children, R.D.E. (born in August of 2019), A.S.E. (born in November of 2020), and J.M.E. (born in November of 2021),[1] pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[2]  After a careful review, we affirm the decrees.

The orphans' court has set forth the relevant facts and procedural history, in part, as follows:

> Mother's most recent interactions with [the orphans' court] began when J.M.E. was adjudicated dependent on March 28, 2022.  This arose from J.M.E. being hospitalized on March 6, 2022, for facial swelling, contusions, and a scalp laceration. [Mother] reported she had been co-sleeping with the child, and the injuries occurred when the child got wedged between the bed and the wall. Mother was removed from the hospital due to her aggressive behaviors while J.M.E. was being treated.  The hospital pressed

---

[*] Former Justice specially assigned to the Superior Court.

[1] Mother has another minor child, L.B., and, as it relates to L.B., Mother became involved with the Erie County Office of Children and Youth ("OCY") in 2011. L.B. moved to Tennessee with her adoptive resource, who has permanent legal custody of L.B.  She was not subject to the involuntary termination of parental rights proceeding at issue in the case *sub judice*.  L.B.'s father voluntarily relinquished his parental rights.

[2] We note the Children each have different biological fathers. As discussed below, the fathers of J.M.E. and A.S.E. voluntarily relinquished their parental rights. The orphan's court involuntarily terminated the parental rights of R.D.E.'s father. None of the fathers are parties to this appeal.

- 2 -

charges, and Mother plead [*sic*] guilty to disorderly conduct on March 10, 2022[.]

\*\*\*

[J.M.E.] was reunified with [Mother] on December 16, 2022. [However,] on January 17, 2023, [J.M.E.], along with his three other half-siblings, were placed under an Emergency Protective Order….The [orphans' court] discussed Mother's mental health requirements with Caseworker [Haley] Schaef, who indicated that…[OCY] "continued to have significant concerns for [Mother's] mental health," and she described "an alleged assault incident on January 15, 2023," wherein Mother "allegedly choked an 8-year-old child."

[A] permanency review hearing was held on May 15, 2023. The hearing was "In the Interest of [L.B.],[3] [J.M.E.], [A.S.E.], and [R.D.E.], minors," [since] all children had been removed from Mother's custody. The [orphans' court] listed Mother and R.D.E., [who is the father of child, R.D.E.,] as parties to the dependency case.[4] OCY received allegations of Mother using inappropriate discipline against all the children in the home, leaving the children home alone, and hitting the children with implements. OCY further interviewed [the eldest child,] L.B., who confirmed the allegations and reported feeling unsafe.

[OCY] further received a report of an incident on January 15, 2023, wherein Mother choked an eight-year-old [child] and dropped [a] one-year-old [child] (later determined to be J.M.E.) in the snow. Mother was intoxicated at the time, and [the] police arrived to find Mother "acting erratically." The [orphans' court] noted Mother's extensive history with [OCY] dating back to 2011 for inappropriate discipline, lack of supervision, substance abuse, untreated mental health, and lack of medical care, adding that the January 2023 incident was "the family's 27th referral." [OCY] renewed its concerns for Mother's history of substance abuse, and

---

[3] As indicated *supra*, L.B. was not subject to the involuntary termination petition in this matter.

[4] As of this time, the fathers of J.M.E. and A.S.E. voluntarily relinquished their parental rights. Thus, R.D.E.'s father was the sole remaining father involved in the dependency and eventual termination of parental rights hearing. The orphans' court involuntarily terminated R.D.E.'s father's parental rights; however, R.D.E.'s father did not file an appeal to this Court.

history of mental health diagnoses, including major depressive disorder, anxiety disorder, and conduct disorder. The [orphans' court] proposed the following Treatment Plan for Mother:

1. Submit to genetic testing to assist in establishing paternity.

2. Refrain from the use of drugs and alcohol. Continue to participate in treatment with Pyramid Healthcare drug and alcohol services and follow recommendations.

3. Continue to participate in Stairways Behavioral Health for therapy and follow all recommendations. Demonstrate mental health stability.

4. Participate with Wagner Behavioral Health for anger management services. Follow all recommendations.

5. Continue to maintain safe and stable housing with appropriate caregivers in the home, working utilities, and safe home conditions. Provide [OCY] with all rent and utility bills paid.

6. Continue to participate in Family Reunification of Family Services of Northwestern Pennsylvania and demonstrate the ability to understand the child's medical and dental needs, as well as ensuring caregivers in and around the house. Demonstrate an understanding of the child's physical and emotional needs.

7. Participate with Parents as Teachers through Erie Family Center and follow through with parenting recommendations.

8. Attend child's medical and any specialist appointment scheduled. Follow through with recommendations. Participate in Early Intervention appointments for the child.

9. Participate in psychological and bonding assessments through Dr. Peter von Korff.

10. Obtain employment or another source of income to ensure that the children's needs can be met in the home.

Between the February 6, 2023, and May 15, 2023, permanency review hearings, Mother was receiving "drug testing and services through Pyramid [Healthcare] as she had been banned from Esper Treatment Center[5] and continues to test positive for THC." Pyramid Healthcare assessed Mother to have cannabis dependence, and [noted that Mother] has consistently tested positive for THC with fluctuating levels every test. As for her ban from the Esper Treatment Center, OCY referred to a February 10, 2023, email "from Ms. Jennifer Esper stating, '[Mother] is not allowed on the property anymore because she is rude, disrespectful, and does not want to follow protocol. Please do not email me in 2 weeks and ask if she can return. She is not allowed on my property ever again.'" In a February 17, 2023, letter from Ms. Esper, she emphatically stated that she "[refused] to subject [her] staff to this abuse a third time!"

At the time of the May 15, 2023, permanency review hearing, Father [of R.D.E.] was "not in a caregiving role for the child," as he was "incarcerated at FCI-Cumberland" due to "federal convictions for Possession with Intent to Distribute Methamphetamine and Conspiracy," and [he was] unable to care for the child. [OCY] noted Father "has a history of substance abuse," and that "[it was] not known if he [was] treating for substance abuse."

\*\*\*

R.D.E., half-brother of J.M.E., was three years old at the time of the May 15, 2023, permanency review hearing. The [orphans' court] noted R.D.E. was regularly receiving speech and occupational therapies in foster care[.] [The orphans' court] further speculated he will likely need a variety of ongoing assessments, counseling, and treatments to sufficiently meet his educational needs given his diagnosis of autism-spectrum disorder and intellectual disability status.

The next permanency [review] hearing was held on August 30, 2023. The recommended goal remained "reunification" for all children. Mother was showing only partial compliance as to her substance abuse requirements, as she tested positive for THC in every urinalysis during this period, as well as tested positive for

---

5 After J.M.E. was initially removed from Mother's care, the orphans' court directed Mother to submit to urine testing at Esper Treatment Center. However, due to Mother's aggressive behavior towards staff, the Esper Treatment Center banned Mother from its property.

methamphetamine on June 13, 2023, and cocaine on July 21, 2023. Mother was assigned her third counselor at Pyramid [Healthcare] after "appearing at the Pyramid Healthcare office and being verbally and physically aggressive towards her prior counselor for suggesting the increase in intensity of treatment." Mother obtained a medical marijuana card on July 14, 2023.

Mother showed only partial compliance with her mental health therapy requirements. While Mother's therapist stated the course of therapy was going well, the [orphans' court] noted OCY's continued concerns that Mother "fail[ed] to demonstrate mental health stability and [was] often noted to act impulsively, erratically, and irrationally." [OCY] reported multiple occasions when Mother "appeared unannounced…at [OCY] to threaten the lives or physical safety of [OCY staff]," and repeatedly called the "FBI [on the] police who pulled [her] over for traffic stops…." Mother reported that "the marijuana gives me all the help I need" when asked about any medication therapy for her mental illness.

R.D.E. broke his arm on a trampoline while with a babysitter on June 10, 2023, as a result of a tantrum, and [he] was rushed to Children's Hospital of Pittsburgh for emergency surgery. Mother "refused to consent to treatment, transportation, or evaluation until foul play [had] been ruled out," leading the [orphans' court] to provide an emergency order to consent to any necessary treatment to medical personnel, who assessed R.D.E.'s fracture as "typical of a child his age breaking their arm on a trampoline." Mother insisted that [OCY] was covering up physical abuse of R.D.E. and made a ChildLine report at 10:45 p.m. on the night of June 10, 2023, alleging physical and sexual abuse of R.D.E. These allegations were never founded, and the foster family and Pittsburgh Hospital staff found Mother "to be combative, belligerent, and inconsolable."

On June 12, 2023, Mother arrived unannounced at [OCY] regarding R.D.E.'s broken arm, and [she] was verbally aggressive towards [the assigned caseworker, Bridgette Gerber-Winschel] and an agency supervisor. Mother stated to [OCY] staff "it's an arm for an arm as far as I'm concerned, and this is not the last of me." The next day, June 13, 2023, OCY received a report that Mother had stated "she intended to f*uck up the foster parents that f*ucked up [R.D.E.]"

On June 23, 2023, Mother arrived late to [OCY] for a scheduled visit with the children. [OCY] cancelled the visit[.] When Mother was notified that the visit was cancelled:

[S]he became verbally and physically aggressive towards [OCY]. [Mother] threatened to kill agency staff, physically harm agency staff, and thew items from the security desk onto the floor. [Mother] approached each agency staff individually to make threats, coming so close to one staff in particular that [Mother] actually pressed her nose to that staff's nose while making verbal threats.

Erie Police Officers were called, and six officers arrived, including two from the crisis unit[.] Mother was "arrested, charged with Disorderly Conduct and Terroristic Threats," and administered a breathalyzer test, which reported Mother had a ".072%" blood alcohol content.

Due to Mother's conduct during June of 2023, the [orphans' court] issued an order making visits with the children virtual and contingent upon clean urines. When Mother learned of this change on July 6, 2023, she "expressed anger…and claimed that '[the orphans' court] judge is a racist and he thinks he is God.'" Father made no progress as to his treatment plan as he [remained] incarcerated during the review period[.]

The next permanency [review] hearing was held on November 8, 2023. The recommended goal was changed to "reunification concurrent with adoption" for all children. Mother had "partially" complied with her substance abuse requirements due to "inconsistent attendance," and her randomized urinalysis tests [were] all positive for "fluctuating levels" of THC. During the review period, Mother renewed her medical marijuana card and provided a copy to [OCY].

Mother was also "partially" complying with her mental health requirements, showing inconsistent attendance to appointments during September of 2023. The [orphans' court] noted that, while [Mother] has at times been consistent with attendance and participation, [OCY] has not seen [Mother] demonstrate mental health stability. [Mother] continues to engage in intimidation tactics with agency staff, service providers, and foster parents. Mother also only "partially" complied with "Family Reunification" services from "Family Services of Northwestern Pennsylvania."

\*\*\*

The next permanency [review] hearing was held on February 28, 2024. The recommended goal was changed to

"Adoption for [A.S.E.], [R.D.E.], and [J.M.E.], [and] Permanent Legal Custodianship for [L.B.]" The [orphans' court] noted [it had] previously [shown] leniency at the November 8, 2023, permanency review hearing by not changing the goal to Adoption at that time. Mother responded by [leaving] the court room [and] exclaiming "f*uck [the orphans' court] judge." Mother…was reported to "not demonstrate mental health stability," and [she] "made multiple threats to report [OCY] to the Erie County Human Relations Commission whenever she [did] not get her way." Mother had missed "4 out of 11 possible appointments with her therapist."

\*\*\*

The final permanency review hearing was held on April 29, 2024. The goal for all children remained as adoption, and the hearing summary is mostly dedicated to the relocation of L.B. to her foster home in Chattanooga, Tennessee, with her aunt. [OCY] renewed their recommendations that "no further services, including visitation to be offered to [Mother] and [Father]."

Orphans' Court Opinion, filed 2/18/25, at 1-13 (citations to record and quotation marks omitted) (footnotes omitted) (footnotes added).

On May 21, 2024, OCY filed a petition to involuntarily terminate the parental rights of Mother as to R.D.E., A.S.E., and J.M.E. (collectively "the Children") under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The orphans' court held termination hearings on October 8, 2024, and December 10, 2024. Mother appeared both days and was represented by counsel. Further, finding no conflict between the legal and best interests of the Children, the orphans' court appointed their guardian *ad litem*, Catherine A. Allgeier, Esquire, to represent the Children's legal interests.[6]

_____

[6] The Orphans' Court found the Children had no conflicting best or legal interests individually or among themselves.

During the hearing, Jeffrey Boyles, the clinical director for Wagner Behavioral Health Services ("Wagner"), testified that, in February of 2023, Mother was referred to Wagner to complete an anger management program. N.T., 10/8/24, at 11, 14. However, she failed to appear on March 23, 2023, April 13, 2023, or April 19, 2023. She was twenty minutes late for the scheduled session on April 6, 2023. *Id.* at 12. Due to Mother's failure to appear for sessions, she was unsuccessfully discharged from the program. *Id.* at 13.

Nicole Sloane Kondrlik, the Chief Public Defender for Erie County, testified her office was appointed to represent Mother, and on October 27, 2023, Mother called the office. *Id.* at 17. Public Defender Kondrlik spoke on the telephone with Mother, and during the conversation, Mother admitted that she had previously called the public defender's office secretary a "fat, sloppy, no-neck that sits at the front desk." *Id.* at 18.

Public Defender Kondrlik informed Mother that such statements had hurt the secretary's feelings, and Mother advised it was "her first amendment right to make any such statement." *Id.* at 19. Public Defender Kondrlik informed Mother that Erie County has a policy protecting employees from harassment, including from clients, and, in response, Mother repeatedly said, "You are going to pay for this." *Id.* Public Defender Kondrlik took this as a threat, and she informed the Sheriff's Department of Mother's statements. *Id.*

Tracy Couse, R.N., who is the Director of Nursing at UPMC Hamot Surgery Center, testified she oversees the staff at the surgery center. *Id.* at 22. Nurse Couse testified that, on July 27, 2023, a staff member informed her that Mother arrived at the surgery center to see A.S.E., who was scheduled to have a circumcision, and she was very upset. *Id.* at 26. Nurse Couse located Mother and attempted to assist her; however, Mother "dismissed [her] from the room and asked [her] if she had something better that [she] could be doing." *Id.* at 27.

Nurse Couse testified Mother was "aggravated," and when she attempted to assist Mother a second time, "things continued to escalate." *Id.* at 28. Nurse Couse testified she was unable to establish a working relationship with Mother because of her behaviors and hostility. *Id.* Mother demanded information, and when the nurse could not provide it, Mother threatened to have her arrested. *Id.* at 31. Nurse Couse testified Mother tried to videotape activities in the surgery center without permission, and, eventually, the nurse called hospital security. *Id.* at 29. At this point, Mother exited the building through the visitation area; however, on her way out, she "caused a scene." *Id.*

Nurse Couse testified that, at 8:00 a.m. on July 28, 2023, Mother telephoned her, and Mother threatened her. *Id.* Mother accused the hospital of not caring about any babies other than white babies, and she told the nurse

"It's going to go down." *Id.* at 30. Mother made references to the "Black Panthers." *Id.*

Peter von Korff, Ph.D., a clinical psychologist, was qualified as an expert in adult psychology with a specialization in bond assessments. *Id.* at 39. Dr. von Korff testified he received a referral to conduct psychological evaluations and bonding assessments for the Children, as well as Mother. *Id.* He had telephone interviews with Mother on six occasions from May 22, 2023, to July 10, 2023. *Id.* at 40. He noted that, during some of these interviews, Mother was "so distressed that she had to cut the session short after only a matter of a few minutes." *Id.* at 42.

Dr. von Korff testified he contacted Mother's treating psychologist, Andrea Zeiber, Ph.D., who reported Mother has mental health issues and experienced difficulties in her formative years. *Id.* at 45. Dr. von Korff opined Mother's treating psychologist "downplayed" the significance of Mother's mental health issues. *Id.* at 47. Dr. von Korff noted that, during 2023, Mother was scheduled to meet with her treating psychologist forty-nine times; however, Mother attended only slightly more than half of the appointments. *Id.* Dr. von Korff opined that Mother suffers from post-traumatic stress disorder, as well as a personality disorder with paranoid and antisocial features, and these mental illnesses impair her ability to work well with others. *Id.* He administered the Minnesota Multiphasic Personality Interview to

Mother, and the results revealed Mother has elevated "persecutory thinking," an "emotionally charged personality," and a "risk-taking" mindset. *Id.* at 62.

Dr. von Korff testified Mother is intelligent and an "intense feeler." *Id.* at 49. He indicated Mother is unable to regulate her emotions, which leads to her "acting out" towards other people. *Id.* He described her as having "a hair-trigger" with "very little self-restraint." *Id.* Dr. von Korff noted that Mother refuses to acknowledge her substance abuse problems, and she refuses recommended pharmacological treatment. *Id.* at 50. For example, Mother presented to her existing treating psychologist as suffering from depression and anxiety; however, she resisted psychological counseling, as well as pharmacological treatment, and desired solely a medical marijuana card. *Id.*

Dr. von Korff clarified that, while Mother's symptoms of depression and anxiety could be controlled with "psych meds," her personality disorders could not be controlled with such medicines. *Id.* Rather, to "get to the root of Mother's mental difficulties," she needs to undergo consistent, meaningful therapy. *Id.* at 51. Dr. von Korff indicated that "medical marijuana alone is not going to address the root cause of [Mother's] issues." *Id.* at 52. Dr. von Korff indicated that, in his opinion, Mother's "marijuana use [has been] more of a negative impact on her ability to address the issues related to her mental health and her relationship with her children than it [has been] a benefit." *Id.*

While it may "take the edge off," it has not assisted Mother in learning healthier interpersonal skills. *Id.*

Dr. von Korff testified he conducted an adult attachment interview with Mother, and he characterized her interview as "dismissing." *Id.* at 54. He explained Mother was "dismissive of attachment itself," and "she normalized the fact that she had parents who neglected her, abandoned her, and gave her really no…meaningful support." *Id.* Mother "prided herself on the fact that she learned early on to manage things and to manipulate others." *Id.* He opined Mother has "normalized, even idealized a very, very unhappy, unfortunate early life circumstance [where] she had a lack of protection." *Id.* at 55. He noted Mother is "dismissive of the idea that an attachment between her and her own Children is an important factor in life." *Id.* In this vein, Dr. von Korff testified Mother wants to be a parent but only to gratify her own interests and not with the idea of protecting and caring for the Children. *Id.* at 57.

Dr. von Korff testified he next conducted a parent development interview with Mother. He indicated that, as it applies to R.D.E., who has autism, Mother spoke of R.D.E.'s self-injuring behavior with "a dismissing tone that bordered indifference." *Id.* at 59. Mother indicated R.D.E. is "a sweet child," but she also complained that he is "problematic," and she "doesn't want to be burdened with the issues that he has related to his autism diagnosis." *Id.* at 60. Mother expressed that she enjoys spending time with A.S.E. as

opposed to R.D.E., who makes more demands on her time and attention due to his autism. *Id.* Dr. von Korff testified that, during "many, many visits," Mother gave R.D.E. her cell phone to play with "to isolate him so that she doesn't have to deal with him." *Id.* Dr. von Korff testified that, when he evaluated Mother with the Children, he observed "avoidant children" who "self-monitor and self-initiate without turning to Mother for support." *Id.* at 61.

Dr. von Korff testified he conducted child play observations of the Children with Mother. Initially, R.D.E. entered the room, and Dr. von Korff observed R.D.E. having a tantrum, which is not unusual for a child with an autistic disorder. *Id.* at 64. After R.D.E. settled, he played with blocks in a repetitive way with a narrow range of interest until A.S.E., J.M.E., and then Mother entered the room. *Id.* at 65. R.D.E. greeted Mother warmly while A.S.E. and J.M.E. greeted Mother in a "perfunctory manner." *Id.* A.S.E. and J.M.E. seemed "detached, tense, and impatient" with Mother. *Id.* at 67. They related to Mother in "an avoidant way." *Id.* Mother did not make any effort to reach out to A.S.E. or J.M.E. *Id.* at 66.

For the most part, Mother "barked at the Children in a very take-charge tone." *Id.* She was "disengaged and disinterested in [the Children's] activities and enthusiasm" during the hour-long assessment. *Id.* at 68. After twenty minutes, Mother complained it was "boring" in the room, and she said she

couldn't believe that she had to spend the hour in the room with the doctor and the Children. *Id.*

Dr. von Korff noted Mother had been instructed to not bring gifts or toys because this was an assessment as opposed to a visit; however, she disregarded the instructions and brought Halloween baskets for the Children. *Id.* at 66. Mother became "aggressive" when Dr. von Korff instructed the baskets had to be removed from the room until after the assessment. *Id.* He noted that, throughout the assessment, Mother complained that she was being prevented from giving the Children their gifts. *Id.* at 68.

Dr. von Korff noted Mother had been offered various parenting services, including from Affinity, where Mother was given opportunities to interact with the Children. *Id.* at 69. Notes from the sessions at Affinity revealed Mother "was moving the kids around by one arm, grabbing them and moving them. She was sitting on the couch and not interacting. She was handing [R.D.E.] the cell phone." *Id.* Mother was also offered services from Family Reunification, Parents as Teachers, and JusticeWorks.

The reports from these service providers revealed Mother had a general "disinterest in the programs and hostility and aggression towards the service providers." *Id.* Mother refused to address her parenting capacities, and as a result, Dr. von Korff noted Mother would be unable to provide a healthy environment for the Children. *Id.* at 70. Dr. von Korff characterized Mother's attachment with the Children as "a very unhealthy, insecure attachment,…and

she is breeding insecurity in these kids." *Id.* Dr. von Korff opined that it would be in the Children's best interest to sever the "unhealthy, insecure attachment" they have to Mother so that they can further their relationships with their present caregivers. *Id.*

Dr. von Korff recognized J.M.E. and A.S.E. have been placed with their respective paternal grandmothers while R.D.E. has been placed with a foster family. *Id.* at 71. The Children are doing well in their current placements, and Dr. von Korff opined severance of the bond with Mother would be beneficial to the Children developing attachments to their present and/or future caregivers. *Id.* He opined Mother is unable to give the Children the nurturing necessary to help them grow and develop. *Id.*

Cara Faga, a parent educator at the Erie Family Center, testified she provides education to parents who are working on reunification with their children. *Id.* at 94. She noted the Parents as Teachers program is utilized by the Erie Family Center, and the program is tailored to the needs of parents. *Id.* In October of 2022, Mother was referred to the Parents as Teachers program, and Ms. Faga initially facilitated visits between J.M.E. and Mother in Mother's home. *Id.* at 97. She noted that, during the visits, Mother prepared meals and did not engage with J.M.E. *Id.*

Thereafter, all of the Children were removed from Mother's care. *Id.* at 100. Ms. Faga testified that Mother attended most of her scheduled visits with the Children; however, particularly in February and March of 2023, Mother

displayed anger towards the staff and accused them of "targeting her." *Id.* at 101. She noted Mother disengaged herself when she visited R.D.E. *Id.* at 102.

At a visit on February 20, 2023, Ms. Faga smelled marijuana on Mother. *Id.* Ms. Faga noted the facility is a "drug and alcohol-free place," and prior to commencing visits, Mother signed a form acknowledging that the facility has a "zero-tolerance policy." *Id.* She noted that, at a visit on March 20, 2023, with R.D.E., Mother spent the visit looking and laughing at items on her cell phone, and she did not interact with anyone. *Id.* at 104. Mother smelled of marijuana, so Ms. Faga asked her if she was under the influence of marijuana. *Id.* Mother became very angry, and when Ms. Faga ended the visit, Mother accused Ms. Faga of being a racist. *Id.* at 105.

Ms. Faga noted Mother made little progress with her parenting goals, and the orphans' court suspended in-person visits due to safety concerns in June or July of 2023. *Id.* at 107. The case was briefly put "on hold," and then virtual visits were scheduled between Mother and the Children on August 7 and 17, 2023; however, Mother failed to attend the visits. *Id.* at 108. Consequently, on October 4, 2023, Mother was discharged as unsuccessful from the program due to her noncompliance. *Id.*

Tara Niedergall, a parent-child interaction specialist at Parents as Teachers, testified she began working with Mother and the Children in February of 2023. *Id.* at 123. Ms. Niedergall testified she supervised visits between the Children and Mother, as well as provided parenting information

to Mother. *Id.* Ms. Niedergall noted R.D.E. often threw tantrums during the visits due to his autistic disorder. *Id.* at 124. She noted Mother often came to the visits smelling like marijuana, and during one occasion, she appeared to be "very much under the influence" with squinty eyes and laughing inappropriately. *Id.* at 125. When Ms. Niedergall asked Mother if she was under the influence, Mother became aggressive. *Id.*

Ms. Niedergall noted that, during a visit, R.D.E. fell a few times on his head while playing with a box, and Mother needed to be prompted three times to remove the box from the room. *Id.* at 126. On another occasion, A.S.E. stood on a table, and because of Mother's inattention, a staff member had to take A.S.E. off the table so that he would not fall. *Id.* at 127. During another occasion, on April 3, 2023, Mother walked away from a changing table while she was changing A.S.E.'s diaper, so staff members had to stand by the table to prevent A.S.E. from falling. *Id.* at 128.

Annette May, a supervisor of the visit coaching program at JusticeWorks, testified Mother was referred to the program on October 25, 2023. *Id.* at 134. Ms. May noted that, during visits between Mother and the Children, two staff members were generally present due to the Children being somewhat unmanageable, as well as Mother's hostility. *Id.* at 136. Ms. May noted R.D.E. was prone to self-harm and attempting to flee the room. *Id.* Ms. May confirmed staff members had to remind Mother to put R.D.E.'s helmet on him. *Id.* at 137. Ms. May testified Mother generally demonstrated "altered

mood and high irritability." **_Id._** at 138. Ms. May observed her yelling at staff, and Mother was not generally agreeable to receiving parenting instruction. **_Id._** Specifically, Mother was not receptive to feedback on how to improve meals, create a safe environment, or encourage play. **_Id._** at 143.

Ms. May testified Mother used her cell phone to soothe R.D.E. **_Id._** at 144. She opined that Mother made no consistent meaningful progress in her parenting capacities during the time she was provided services by JusticeWorks. **_Id._** at 145. She noted Mother displayed aggression and hostility, and it impacted staff members' ability to assist Mother. **_Id._**

Amanda Dicola, a family reunification caseworker at Family Services of Northwestern Pennsylvania ("Family Services"), testified she became the caseworker on March 13, 2023, and she continued as such until April 2, 2024, when the orphans' court changed the goal to adoption. **_Id._** at 160. Ms. Dicola testified Mother's goals were to provide a safe and stable environment, increase financial stability, refrain from the use of alcohol or drugs, improve her knowledge of child safety, and increase her parenting skills. **_Id._** at 162.

She noted that, during visits with R.D.E., Mother used "trigger" words to discipline him, and this caused R.D.E.'s temper tantrums to escalate to the point of self-harm. **_Id._** She indicated that, during Mother's supervised visit with R.D.E. on March 22, 2024, R.D.E. had "nine temper tantrums" while Mother remained sitting on the couch. **_Id._** Ms. Dicola testified that, on March

25, 2024, the staff had a team meeting with Mother to discuss areas of concern. *Id.* at 165. Mother became defensive. *Id.*

Ms. Dicola testified that, at this point, Mother progressed in securing safe and stable housing; however, she had minimal progress in achieving financial stability, increasing her parenting skills, or refraining from the use of drugs and alcohol. *Id.* at 167. During visits, she observed that Mother smelled of marijuana and appeared to be under the influence thereof. *Id.* at 168. She acknowledged Mother had a medical marijuana card, but she was sometimes under the influence to a degree that was unsafe for the Children. *Id.* at 167. She noted Mother's visits never progressed past supervised visits. *Id.* at 170. She concluded that Mother's involvement with the program was "unsuccessful." *Id.* at 172.

Haley Schaef, an OCY caseworker, confirmed that, on March 9, 2022, OCY received an emergency protective order for J.M.E. N.T., 12/10/24, at 9. J.M.E. was adjudicated dependent on March 28, 2022, due to Mother's mental health issues, substance abuse, and aggressive behaviors. *Id.* at 11. At this time, A.S.E. and R.D.E. remained in Mother's care. *Id.* at 13.

Ms. Schaef testified she began working with Mother as the OCY caseworker, but it was difficult to assist Mother because she was "combative" and refused to acknowledge the reasons J.M.E. came into care. *Id.* at 12. Ms. Schaef noted that, in 2020, Mother had a mental health assessment, and her

diagnosis was major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder. *Id.* These records were provided to OCY. *Id.*

Ms. Schaef confirmed that, on July 26, 2022, Mother was "kicked out of the Esper Treatment Center" where she was supposed to submit to random urinalysis screens. *Id.* at 16. Ms. Schaef acknowledged that Mother initially had moderate compliance with her goals as to J.M.E., so J.M.E. was returned to her care on December 15, 2022. *Id.* at 17. However, a month later, OCY received information that J.M.E., as well as his half-siblings, A.S.E. and R.D.E., were being verbally, physically, and emotionally abused. *Id.* at 18.

Specifically, OCY received allegations of Mother hitting the Children with implements, leaving them unsupervised, and failing to meet their educational/developmental needs by failing to utilize the early intervention services. *Id.* Ms. Schaef noted that it was important for R.D.E., who has autism, and A.S.E., who was "nonverbal" when removed from Mother's care, to receive early intervention services. *Id.* at 21. However, despite R.D.E.'s and A.S.E.'s special needs, Mother did not "follow through" with the services. *Id.*

There was also an allegation that Mother choked an eight-year-old child, and there were concerns about Mother's substance/alcohol abuse. *Id.* Ms. Schaef testified that, after J.M.E. was returned home to Mother in December of 2022, the situation regressed quickly. *Id.* Accordingly, all three Children were removed from Mother's care via an emergency protective order on

January 17, 2023. *Id.* at 19. During the removal, Mother was intoxicated. *Id.* at 24. Since J.M.E. was already adjudicated dependent, OCY filed dependency petitions for A.S.E. and R.D.E., which the orphans' court granted on January 31, 2023. The Children were placed in foster homes. *Id.*

Ms. Schaef testified that, thereafter, Mother refused medication to treat her mental health illnesses, and she continued to demonstrate instability with her mental health. *Id.* at 25. Ms. Schaef testified that she was replaced as the OCY caseworker for Mother on February 22, 2023. From the point of removal of the Children in January of 2023 to February 22, 2023, Ms. Schaef saw little positive progress by Mother. *Id.* at 27.

Bridgette Gerber-Winschel, an OCY caseworker, testified she became the OCY caseworker for this case on February 22, 2023. *Id.* at 45. Ms. Gerber-Winschel testified she had many unannounced and announced home visits with Mother, and Mother was generally "belligerent, inconsolable, [and] volatile." *Id.* at 46. She noted that, on February 25, 2023, Mother saw a news story about a missing child, and Mother called the Pennsylvania State Police to report that the child was J.M.E. *Id.* However, when the police investigated, they found J.M.E. safe in his foster home. *Id.*

Ms. Gerber-Winschel testified she observed eleven visits between Mother and the Children. *Id.* at 52. She testified that, during the visits, Mother often called A.S.E. "fat" and would allow him to crawl unsafely under furniture. *Id.* Mother allowed R.D.E. to have tantrums, and she would give

him a cell phone so that she didn't have to interact with him. *Id.* J.M.E. was Mother's "obvious favorite," and she changed his diaper often during the visits. *Id.* at 53. Ms. Gerber-Winschel noted Mother fed J.M.E. inappropriate sizes of food for his age. *Id.*

Ms. Gerber-Winschel testified Mother was offered many services, including by Parents as Teachers; however, Mother "just decided what she wanted to do and would not take direction." *Id.* at 54. She noted Mother was not "accepting" of R.D.E.'s autism diagnosis, and she refused to believe he had autism. *Id.* at 57. Ms. Gerber-Winschel testified she saw no evidence during the visits that Mother was able to safely parent the Children, and the reasons for the dependency continued to exist during Ms. Gerber-Winschel's involvement. *Id.*

Ms. Gerber-Winschel noted there were two specific instances, which prevented her from working effectively with Mother. Specifically, on June 12, 2023, Mother arrived at OCY unannounced after learning of R.D.E.'s trampoline accident, and Mother told Ms. Gerber-Winschel "it's an arm for an arm as far as I'm concerned." *Id.* Criminal charges were filed against Mother in connection with this threat. *Id.*

On June 23, 2023, Mother showed up late for her scheduled visitation, and, thus, the visit was cancelled. Ms. Gerber-Winschel testified Mother threatened to kill OCY staff, and Mother "physically pressed her nose up to [Ms. Gerber-Winschel] like a boxing or UFC match threatening to…beat [her]

- 23 -

ass." *Id.* at 50. Six Erie Police Officers responded, Mother blew a .072% alcohol on the breathalyzer, and Mother continued to yell threats at OCY staff. *Id.* at 51. Criminal charges were filed against Mother. *Id.* Ms. Gerber-Winschel testified Mother had directly threatened her life, so the case was transferred to another OCY caseworker on June 27, 2023. *Id.* at 52.

Ms. Gerber-Winschel noted that, during the time she was the caseworker for the family, the Children were doing well in their placements. *Id.* at 59. J.M.E. was receiving occupational therapy; A.S.E. was receiving speech and occupational therapy; and R.D.E. was receiving speech and occupational therapy. *Id.* at 59-60. Ms. Gerber-Winschel indicated that, while the Children were in placement, they began having positive progressions with their development and behavior. *Id.* at 60. For example, R.D.E. was having fewer tantrums, and A.S.E. went from "impatient and volatile" to compassionate. *Id.*

Cassandra Angelotti, a social service aide with OCY, testified she became involved with this case on January 28, 2023. *Id.* at 76. She testified that Mother repeatedly missed visits with the Children, as well as demonstrated erratic behavior. *Id.* This resulted in OCY rescheduling visitation and requiring Mother to confirm the night before a scheduled visit as to whether she planned to attend. *Id.*

Ms. Angelotti testified she was present when Mother became angry on June 23, 2023, and "got in Bridgette's face." *Id.* She noted that, on May 19,

2023, she was present for one of Mother's visitations with the Children, and she needed to stop the visitation due to Mother's "inappropriate conversation with the Children." *Id.* at 78. Specifically, Mother told the Children that "the government is corrupt," and she told them Ms. Angelotti was "abusing [her] authority and discriminating against [Mother]." *Id.*

When Ms. Angelotti asked Mother to leave the visitation room, Mother resisted, which led to the Children "showing disruptive behaviors, including yelling[.]" *Id.* at 80. When Mother finally began exiting the room, R.D.E. attempted to "dart out" the door, and Mother "forcefully pushed [R.D.E.] with the back of her leg[.]" *Id.* Mother stated, "[I]f you're going to make me leave the visit, you can pick up my child off the floor." *Id.* Ms. Angelotti noted that, during this exchange, Mother got "right up to [Ms. Angelotti's] nose." *Id.* at 87.

Ms. Angelotti testified that, from the beginning, Mother had difficulties with managing R.D.E.'s special needs. *Id.* at 82. As it relates to J.M.E., Mother showed the most affection toward him and ensured that his diaper was changed. *Id.* at 83. On September 8, 2023, Mother allowed the Children to "eat a whole bag of cotton candy," which then led to problematic behavior from the Children. *Id.* at 84. On October 6, 2023, Ms. Angelotti accompanied Mother and the Children on a "community outing" to a pizza shop. *Id.* Mother allowed the Children to throw the shop's Halloween decorations on the floor. *Id.*

Ms. Angelotti noted that Mother was generally unable to redirect or control the Children. *Id.* at 85. Additionally, Mother often made derogatory and rude comments to OCY staff members, foster parents, and service providers. *Id.* She also demonstrated no awareness of personal space or how to maintain appropriate boundaries. *Id.* Ms. Angelotti noted she stopped supervising visits in October of 2023, and the case was transferred to JusticeWorks. *Id.*

Kathy Mountain, a caseworker for OCY, testified she took over as the caseworker near the end of June of 2023. *Id.* at 96. Ms. Mountain noted that, when she told Mother that visitation was contingent on "clean urines," Mother stated the orphans' court judge was "a racist." *Id.* at 98. Ms. Mountain noted Mother's urine screens tested positive for methamphetamine on June 13, 2023, and cocaine on July 21, 2023. *Id.* at 100. On August 31, 2023, Mother was unsuccessfully discharged from Parents as Teachers due to her noncompliance. *Id.*

Ms. Mountain indicated Mother's visits with the Children were switched to virtual, rather than in-person, because Mother's behavior was erratic, her mental health was unstable, and she failed her urine screens. *Id.* Mother became "irate" when she was informed that the visits would be virtual. *Id.* Ms. Mountain testified it was difficult for her to effectively assist Mother since Mother was hostile; however, she continued to try to provide services to Mother and remain "unbiased." *Id.* at 106.

She noted Mother has continued to demonstrate mental health issues, as well as an inability to communicate and interact with others in a respectful manner. *Id.* at 111. Mother has demonstrated no ability to safely parent the Children. *Id.* at 115. On May 29, 2024, Mother texted harassing messages to R.D.E.'s foster family, and Mother pled guilty to criminal charges in connection therewith on September 3, 2024. *Id.* at 113.

Ms. Mountain testified that J.M.E. and A.S.E. were placed with their respective paternal grandmothers while R.D.E. has been living with a foster family. *Id.* at 102. She testified J.M.E. has "come a long way" since being removed from Mother's care. *Id.* at 117. She indicated that A.S.E. was diagnosed with ADHD and separation anxiety, and since he has been out of Mother's care, these issues are being addressed. *Id.* She further indicated R.D.E. is "doing very well" out of Mother's care, and since visitation with Mother has ceased, he is "a lot calmer." *Id.* at 118.

Ms. Mountain testified the Children's needs are being met, and they have shown positive progression in their behaviors/development. *Id.* at 117. Ms. Mountain opined that, if Mother's parental rights are terminated, it would not be detrimental to the Children. *Id.* at 119.

Andrea Zeiber, Ph.D., the clinical supervisor at Stairways Behavioral Health ("Stairways"), testified she was Mother's treating psychologist from March 14, 2023, to May 15, 2024. *Id.* at 162. Prior thereto, Mother was treating with Kayla Walker, who was a therapist at Stairways; however,

Mother and Ms. Walker were not "a good fit." *Id.* at 163. Dr. Zeiber indicated she was attempting to assist Mother with working on her anger management issues, maladaptive cognitions, lifestyle, and attachment difficulties. *Id.* at 170, 172.

Dr. Zeiber testified Mother suffers from post-traumatic stress disorder. *Id.* at 175. She opined that Mother's "challenging behaviors" stem more from her life difficulties as opposed to mental health issues. *Id.* On June 14, 2023, Mother underwent a psychological evaluation, and she was prescribed Zoloft and Vistaril. *Id.* at 177. Mother reported she took the medications for "a couple weeks," but she then discontinued the medications. *Id.*

Dr. Zeiber testified that Mother began making lifestyle changes, including removing "toxic" people from her life and eating healthier food. *Id.* at 178. Dr. Zeiber focused on giving Mother communication and proper advocacy tools. *Id.* Dr. Zeiber testified she was able to work with Mother because she provided Mother with "a safe place" and "did not judge her." *Id.* at 180. She opined that Mother has showed positive progress throughout her treatment. *Id.* at 181. However, she admitted that the goal of anger management was not attained with Mother, who pled guilty to various criminal charges during this case. *Id.* at 197. She further admitted that she has never observed Mother with the Children. *Id.*

Mother testified she was involved with OCY when she was a child, and she does not trust OCY. *Id.* at 206. Mother admitted that J.M.E. was injured

during a co-sleeping incident, and she felt very bad about it. *Id.* at 207. Mother indicated that, in January 2023, she was with an eight-year-old family member, and the eight-year-old was making fun of R.D.E., who has disabilities. *Id.* at 208. She indicated the eight-year-old punched her in the face, and she called the police, who "took the side" of the eight-year-old child. *Id.* at 209. At this point, OCY removed the Children from Mother's home. *Id.* at 211.

Mother indicated she completed the drug and alcohol assessment, and she was informed she needed to do urine screenings at the Esper Treatment Center. *Id.* at 213. She noted the difficulties she had with the staff at the treatment center related to the long wait lines, which made her late for work. *Id.* She admitted she was "bossy." *Id.* She indicated she then enrolled with Pyramid Healthcare. *Id.* at 215.

Mother indicated she has a medical marijuana card, and she uses marijuana to calm her anxiety. *Id.* at 216. She admitted that, at one point, her medical marijuana card expired, and she purchased marijuana "off the street." *Id.* at 218.

Mother testified she stopped going to Wagner for her anger management treatment because they "continuously asked triggering questions" regarding the removal of the Children. *Id.* at 219. Mother admitted she stopped taking prescribed medications for her mental health because she believes there are more "spiritual, natural types of ways" to treat the issues.

***Id.*** at 221. Mother admitted she acted aggressively towards OCY staff members; however, she indicated it was "the mama bear [coming] out of her." ***Id.*** at 222.

Mother testified she has been unable to visit the Children since April of 2024. ***Id.*** at 231. She indicated she has a two-bedroom apartment, as well as two jobs. ***Id.*** at 232. She testified it would be detrimental to the Children if her parental rights are terminated because "every kid needs their parent." ***Id.*** She indicated she is bonded with the Children, and they are bonded with her. ***Id.*** at 233.

At the conclusion of the hearing, by decrees entered on December 18, 2024, the orphans' court terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Mother filed three separate timely counseled notices of appeal, as well as contemporaneous concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[7] The orphans' court filed a responsive opinion with detailed factual findings and a thorough analysis of the issues.

On appeal, Mother raises the following issues in her "Statement of the Questions Presented" (verbatim):

  1. Whether the trial court abused its discretion in finding grounds for termination of parental rights existed under Section 2511(a)(1) of the Adoption Act, when insufficient evidence was

---

[7] This Court *sua sponte* consolidated Mother's notices of appeal.

presented to indicate that Mother had evidenced a settled purpose of relinquishing rights?

2. Whether the trial court abused its discretion in finding grounds for termination of parental rights existed under Section 2511(a)(2) of the Adoption Act, when insufficient evidence was presented to indicate that the conditions and causes of incapacity, abuse, neglect, or refusal to parent the child could or would not be remedied?

3. Whether the trial court abused its discretion in finding grounds for termination of parental rights existed under Section 2511(a)(5) of the Adoption Act, when insufficient evidence was presented to indicate that the conditions that led to placement had not been remedied after six months of placement?

4. Whether the trial court abused its discretion in finding grounds for termination of parental rights existed under Section 2511(a)(8) of the Adoption Act, when insufficient evidence was presented to indicate that the conditions that led to placement had not been remedied after twelve months of placement?

5. Whether the trial court abused its discretion in finding grounds for termination of parental rights existed under Section 2511(b) of the Adoption Act, when insufficient evidence was presented relative to the subject Children's bond with Mother, nor was objective evidence concerning the Children's best interests presented?

Mother's Brief at 4-5 (unnecessary capitalization and suggested answers omitted).

Our standard of review is well-settled:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the [orphans'] court's factual findings and legal conclusions.  However, our standard of review is narrow: we will reverse the [orphans'] court's order only if we conclude that the [orphans'] court abused its discretion, made an error of law, or lacked competent evidence to support its findings.  The [orphans' court] judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). Further, we have stated:

> Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result. We are bound by the findings of the [orphans'] court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The [orphans'] court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the [orphans'] court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citations omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. The orphan's court must initially determine whether the conduct of the parent warrants termination under Subsection 2511(a). Only if the court determines that the petitioner established grounds for termination under Subsection 2511(a) does it then engage in assessing the petition under Subsection 2511(b), which involves a child's needs and welfare. *In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 267 (2013). To involuntarily terminate parental rights, the petitioner must prove grounds under both Subsections 2511(a) and (b) by clear and convincing evidence. *Id.*

Instantly, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with the

orphans' court's findings under any one enumerated Subsection of 2511(a), as well as 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

In this case, we review the decrees pursuant to Subsections 2511(a)(8) and (b), which provide as follows.[8]

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
>> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>>
>> . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b) (bold in original).

---

[8] Based on our disposition, we need not consider Mother's issues with respect to Subsections 2511(a)(1), (2), and (5). ***See In re Adoption of K.M.G.***, 219 A.3d 662, 672 (Pa.Super. 2019) (*en banc*).

Pursuant to Subsection 2511(a)(8), the petitioner must prove (1) the child has been removed from parental care for 12 months or more; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) the termination of parental rights would best serve the needs and welfare of the child. This Court has explained:

> Unlike other subsections, § 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. *In re M.A.B.*, 166 A.3d 434, 446 (Pa.Super. 2017). "[T]he relevant inquiry" regarding the second prong of § 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super. 2009). Further, the Adoption Act prohibits the court from considering, as part of the § 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).
>
> Although § 2511(a) generally focuses on the behavior of the parent, the third prong of § 2511(a)(8) specifically "accounts for the needs of the child." *In re C.L.G.*, 956 A.2d 999, 1008-09 (Pa.Super. 2008) (*en banc*). This Court has recognized "that the application of [§ 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of [his] children." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).
>
>> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time…in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*In re M.E.*, 283 A.3d 820, 832 (Pa.Super. 2022) (citation omitted).

Subsection 2511(b) requires the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child" when considering whether to involuntarily terminate parental rights. 23 Pa.C.S.A. § 2511(b). Our Supreme Court, in *In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993), first recognized that the "emotional needs and welfare" analysis under Subsection 2511(b) should include, in part, the child's bond with his or her parent. In doing so, the Court later articulated that the effect on the child of severing a bond with a parent requires "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *In the Interest of K.T.*, ___ Pa. ___, 296 A.3d 1085 (2023).

In concluding OCY proved the grounds for termination, by clear and convincing evidence, under Subsections 2511(a)(8) and (b), the orphans' court relevantly indicated the following:

> Termination of Mother's parental rights is justified under 23 Pa.C.S.A. § 2511(a)(8). The Children have been out of Mother's care through the action of the [orphans'] court since January 2023, [which is more than twelve months ago]. Mother's issues with mental health and substance abuse continue to exist, and [the issues] are unlikely to meaningfully improve in a reasonable time due to how Mother has interacted with nearly all agency officials, service workers, and Court personnel. Further, as Dr. von Korff [and] Caseworker Kathy Mountain [testified], the involuntary termination of Mother's parental rights will best serve the needs and welfare of the [Children]. Therefore, the [orphans'

court] finds Mother's parental rights should be involuntarily terminated under 23 Pa.C.S.A. § 2511(a)(8).

\*\*\*

Termination of Mother's…parental rights are justified under 23 Pa.C.S.A. § 2511(b). Any discussion of the Children's "developmental, physical and emotional needs and welfare," must include R.D.E.'s diagnosis of autism and A.S.E.'s diagnoses of ADHD and separation anxiety….Mother does not believe R.D.E. has autism and believes he [will] outgrow the condition. Dr. von Korff sheds light on this reaction, saying that she saw R.D.E.'s condition as "problematic" and something "she doesn't want to be burdened with," preferring to interact with A.S.E. due to that child not being as demanding. Further, Caseworker Kathy Mountain testified to the significant change in R.D.E.'s condition since removal from Mother's care and the newfound consistency in R.D.E. receiving treatment services, which has fostered that improvement.

Caseworker Haley Schaef testified that, at the time of removal from Mother's care, A.S.E. was "nonverbal." However, Caseworker Kathy Mountain stated that, while A.S.E. has been diagnosed with ADHD and separation anxiety, A.S.E.'s placement family is addressing these issues. Ms. Mountain said A.S.E. is "doing very well" with his placement family, which is in marked contrast to his condition in Mother's care.

Orphans' Court Opinion, filed 2/18/25, at 44-45 (citations to record omitted).

Further, the orphans' court noted the attachment between Mother and the Children is "a very unhealthy, insecure attachment[.]" *Id.* at 22. It would be in the Children's best interest that the "unhealthy, insecure attachment be severed so that the Children can further their relationships with their foster families[.]" *Id.* at 23.

We find no abuse of discretion. *In re L.M.*, *supra* (setting forth our standard of review). With respect to the first prong of Subsection 2511(a)(8), the record demonstrates the Children have been removed from parental care

for twelve months or more.

With respect to the second prong of Subsection 2511(a)(8), we agree with the orphans' court that OCY met its burden of proving the conditions which led to the removal or placement of the Children continue to exist. **See In re T.S.M.**, **supra** (setting forth the burden of proof in termination cases). Specifically, the Children were removed from Mother's care due to concerns about her mental health, substance abuse, and inability to provide a safe environment for the Children. Mother's irascible attitude towards nearly every individual appointed to assist her, and her unwillingness to work with service providers, has contributed to the conditions which led to the removal or placement of the Children continuing to exist. Notably, Dr. von Korff described Mother as having "a hair-trigger" with "very little self-restraint." N.T., 10/8/24, at 49. However, Mother refused to comply with the orphans' court's goal of completing anger management. Thus, OCY met the second prong of Subsection 2511(a)(8).

With respect to the third prong of Subsection 2511(a)(8), we agree with the orphans' court that CYS proved termination of Mother's parental rights will best serve the needs and welfare of the Children, who have special developmental needs. **See In re T.S.M.**, **supra** (setting forth the burden of proof). The Children's mental, physical, and behavioral needs are being met by their placement families. Any bond between the Children and Mother is "unhealthy [and] insecure." N.T., 10/8/24, at 49. The orphans' court

determined that the Children's need for permanency is paramount in this case, particularly in light of the Children's special needs. We discern no abuse of discretion. ***In re L.M.***, ***supra***.

Having determined the orphans' court properly found OCY met its burden under Subsection 2511(a)(8), we next examine whether termination is in the best interests of the Children under Subsection 2511(b). ***See In re C.L.G.***, 956 A.2d at 1009 (holding that, after we resolve the analysis of the "needs and welfare of the child" under Subsection 2511(a)(8), we must then address the "needs and welfare of the child" under Subsection 2511(b)). Bond, permanency, stability, and all other intangibles are "all of 'primary' importance in the Subsection 2511(b) analysis." ***In the Interest of K.T.***, ***supra***, 296 A.3d at 1109. It is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." ***Id.*** We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. ***See id.***

Here, as indicated *supra*, the orphans' court determined any bond between the Children and Mother is an "unhealthy, insecure attachment." Orphans' Court Opinion, filed 2/18/25, at 22. The orphans' court found the severance of any bond the Children have with Mother would be beneficial to the Children. ***Id.*** at 23. Severance thereof would be beneficial so that the Children may develop attachment with families that "are healthier, more secure environments." ***Id.*** In considering the totality of the circumstances,

we discern no abuse of discretion by the orphan's court in terminating Mother's parental rights under Subsection 2511(b).

For all of the foregoing reasons, we affirm the orphans' court's decrees involuntarily terminating Mother's parental rights to the Children.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 06/27/2025